# STATE OF MICHIGAN

# COURT OF APPEALS

SECURA INSURANCE,

        Plaintiff-Appellee/Cross-Appellee,

v

ALAN HUGHES and ELON HUGHES,

        Defendants-Appellants,

and

DELBERT ROSENBERRY and LAND ESCAPE
OUTDOOR MAINTENANCE d/b/a OUTDOOR
CREATIONS,

        Defendants,

and

CITIZENS INSURANCE COMPANY,

        Defendant-Appellee/Cross-
        Appellant.

SECURA INSURANCE,

        Plaintiff-Appellee,

v

ALAN HUGHES, ELON HUGHES, DELBERT
ROSENBERRY, LAND ESCAPE OUTDOOR
MAINTENANCE d/b/a OUTDOOR
CREATIONS,

        Defendants,

and

CITIZENS INSURANCE COMPANY,

UNPUBLISHED
August 13, 2015

No.   320943
Oakland Circuit Court
LC No.   2012-125894-CK

No.   321190
Oakland Circuit Court
LC No.   2012-125894-CK

Defendant-Appellant.

SECURA INSURANCE,

Plaintiff-Appellee,

v

No. 321856
Oakland Circuit Court
LC No. 2012-125894-CK

ALAN HUGHES, ELON HUGHES, and
DELBERT ROSENBERRY,

Defendants,

and

LAND ESCAPE OUTDOOR MAINTENANCE
d/b/a OUTDOOR CREATIONS,

Defendant-Appellant,

and

CITIZENS INSURANCE COMPANY,

Defendant-Appellee.

Before: RONAYNE KRAUSE, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

Secura Insurance Company filed a declaratory judgment action to determine its duty to defend and indemnify its insured, Land Escape Outdoor Maintenance (LEOM), in a third-party liability suit filed by Alan and Elon Hughes after a motor vehicle accident involving a dump truck owned by LEOM. Citizens Insurance Company, which covered the Hughes' vehicle, intervened in the suit and argued in favor of coverage under the Secura policy to avoid its duty to pay uninsured motorist coverage to its insureds.

The circuit court ruled that under the plain language of the Secura commercial automobile policy, LEOM did not have liability coverage for the dump truck. Accordingly, the circuit court granted summary disposition in favor of Secura and against LEOM and Citizens.

The circuit court erred in its reasoning. The Secura policy is clearly ambiguous as the General Change Endorsement indicates that liability coverage is available, while other documents within the policy state that liability coverage does not apply. However, the unrebutted evidence establishes that the parties intended at the time of contract execution to eliminate liability coverage and maintain only comprehensive coverage. Given the lack of any genuine issue of material fact, we affirm the circuit court's summary disposition order.

-2-

I. BACKGROUND

In approximately 2000, LEOM contacted an independent insurance agency, Insurance Advisors, Inc. (IA), seeking advice on the proper insurance coverage to meet its needs. The landscape company wished to save insurance costs by procuring a policy that would allow it to reduce coverage in the winter months when it placed vehicles in storage. IA recommended Secura and LEOM purchased various policies through the company, including a commercial automobile policy. Over the next decade, LEOM's owner, Chris Yatooma, or a member of his staff would contact IA in the fall and request that specified vehicles be placed "in storage." IA would then instruct Secura to reduce coverage on those vehicles to comprehensive only. In the spring, LEOM would contact IA again and request that full coverage be replaced on the vehicles. It appears that IA instructed Secura to reinstate all coverage for certain vehicles (including personal protection insurance) and only liability coverage for others.

On November 24, 2010, LEOM office manager Megan McKeogh sent an email to Jennifer Medwid at IA, directing IA to "put . . . the '96 F800 in storage" because it "has been in the shop." On December 9, 2010, Medwid forwarded a policy change request to Secura, instructing the company to "[d]elete all liability coverages" and "ADD Comprehensive" for the vehicle in question. Secura processed the request on December 22, 2010, and mailed various insurance documents directly to LEOM. The first page of the packet, entitled "General Change Endorsement" listed the dump truck and indicated that the insurer was "amending the following unit[] to *liability only* coverage," contrary to the instructions from IA and the expressed wishes of LEOM. (Emphasis added.) The endorsement indicated that it did not stand alone as a description of the coverage available to the insured, directing the insured to refer to "the common policy conditions, coverage form(s) and forms and endorsements." (Emphasis omitted.) The second page, entitled "Endorsement Schedule," directed the insured to "refer to coverage part for full explanation." (Emphasis omitted.) A "Coverage Change Endorsement" included in the materials provided on December 22, assigned a $0 limit for liability, uninsured, underinsured, property damage, and medical pay coverage, and described that the vehicle was covered for comprehensive with a $1,000 deductible. A "Schedule of Autos" detailed various sums credited to LEOM's account for coverage that had been eliminated, including $422 for liability coverage.

In Spring 2011, as Yatooma and McKeogh prepared to return the LEOM fleet to employment, the pair reviewed the registration status and insurance coverage applicable to each vehicle. After reading only the General Change Endorsement from the December 22, 2010 Secura packet, they determined that liability coverage had been maintained on the dump truck over the winter months and no further action was required to make the vehicle "road legal." LEOM renewed the dump truck's vehicle registration with the Secretary of State and began using the vehicle in the landscape business.

On June 20, 2011, the dump truck was involved in a motor vehicle accident with Alan Hughes.[1]  As noted, the Hughes filed suit against LEOM,[2] which requested a defense and coverage from its insurer.  Secura apparently recompensed LEOM for the physical damage to the dump truck through the comprehensive coverage applicable to the vehicle.  Secura also provided a defense in the Hughes lawsuit although with a reservation of rights.  Secura asserted its belief that the dump truck did not have liability coverage because LEOM had not paid for such coverage since November 24, 2010, as noted in the Schedule of Autos.  Secura insisted that the General Change Endorsement's notation that the vehicle possessed "liability only" coverage was a scrivener's error.

To resolve the coverage dispute, Secura filed a declaratory judgment action.  The Hughes thereafter filed suit against their insurer, Citizens Insurance Company, seeking uninsured motorist coverage.  Citizens in turn, intervened in the current lawsuit, seeking to prove Secura's duty and avoid any liability on its part for uninsured motorist benefits.  In a separate action, LEOM sued IA for negligence and negligent and fraudulent misrepresentation in the procurement of LEOM's insurance coverage from Secura.[3]

The circuit court ultimately granted summary disposition in Secura's favor and denied motions for summary disposition filed by LEOM and Citizens.  The court ruled, in relevant part:

> [A]fter reviewing all of the policy documents, the Court finds that there was no liability coverage for the 1996 Ford F800 on the date of the accident.  Both the "Coverage Change Endorsement" and ["]Schedule of Autos" clearly demonstrate that, consistent with [LEOM]'s request, the policy was amended to delete liability coverage on the 1996 Ford.  In addition, the "General Change Endorsement" indicates a premium refund consistent with the deleted coverage.  The evidence shows that [LEOM] would routinely remove liability coverage for its vehicles during the winter and would call when it wanted to reinstate the coverage.  The policy was changed more than 20 times since January 2009 pursuant to these change requests by [LEOM].  Each time a policy change request was processed, Secura would issue a "General Change Endorsement" and a "Coverage Change Endorsement."  There is no evidence that [LEOM] paid the premium associated with liability coverage for the 1996 Ford after it requested the policy change or returned the premium refund.  The Court finds that any reliance by Yatooma on only the "General Change Endorsement" was not reasonable under the circumstances presented.  *Therefore, Secura is entitled to summary disposition because the clear, unambiguous language of the policy provides that the 1996*

---

[1] Delbert Rosenberry was driving the dump truck at the time of the accident.  LEOM contends that Rosenberry was a former independent contractor and did not have permission to drive the vehicle at that time.

[2] Elon Hughes raised derivative claims in the lawsuit against LEOM.

[3] LEOM's appeal in its action against IA is submitted with the current consolidated appeals in Docket No. 321859.

*Ford F800 was not a covered auto for purposes of liability coverage at the time of the accident.* For the reasons above, in addition to the earlier Summary Disposition Opinion that found a question of fact as to whether Rosenberry had permission to operate the vehicle at the time of the accident, *the Court finds that Citizens is not entitled to summary disposition.* [Emphasis added.]

The current appeals followed and this Court consolidated the matters for review.

## II. STANDARDS OF REVIEW

We review de novo a circuit court's resolution of a summary disposition motion. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013).

> A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher*, 300 Mich App at 139-140.]

The interpretation of an insurance policy is a question of law that we also review de novo. *Hunt v Drielick*, 496 Mich 366, 372; 852 NW2d 562 (2014).

> An insurance policy is similar to any other contractual agreement, and, thus, the court's role is to "determine what the agreement was and effectuate the intent of the parties." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992). "[W]e employ a two-part analysis" to determine the parties' intent. *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 172; 534 NW2d 502 (1995). First, it must be determined whether "the policy provides coverage to the insured," and, second, the court must "ascertain whether that coverage is negated by an exclusion." *Id.* (citation and quotation marks omitted). [*Hunt*, 496 Mich at 372-373.]

In interpreting an insurance policy, we must give "its terms their ordinary and plain meaning if such would be apparent to a reader of the instrument." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 367; 817 NW2d 504 (2012) (quotation marks and citation omitted).

## III. ANALYSIS

The circuit court correctly granted summary disposition in Secura's favor, and denied LEOM's and Citizens' motions for judgment in their favors, albeit for the wrong reasons. The

Secura policy was ambiguous because it contained irreconcilable internal inconsistencies. The ambiguity could be resolved at the summary disposition phase, however, because unrebutted evidence established that the parties shared the intent to reduce coverage to comprehensive only at the time of contract execution.

## A. POLICY IS AMBIGUOUS

The documents provided to LEOM by Secura were internally inconsistent. The General Change Endorsement stated that the coverage for the F800 was amended "to liability only coverage." The General Change Endorsement directed LEOM to look to coverage forms, other forms, and endorsements to complete the insurance agreement. See *Forge v Smith*, 458 Mich 198, 207; 580 NW2d 876 (1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together."). One such endorsement was the Coverage Change Endorsement. It indicated that LEOM had comprehensive coverage for the F800 with a $1,000 deductible. It also provided that LEOM had a "$0" policy limit for several categories, including liability. Moreover, the Schedule of Autos showed a blank space next to the liability insurance limit. Within the policy itself is "Item Two-Schedule of Coverages and Covered Autos," which states:

> This policy provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as covered "autos." "Autos" are shown as covered "autos" for a particular coverage by the entry of one or more symbols from the COVERED AUTO Section of the Business Auto Coverage Form next to the name of the coverage.

The Schedule of Autos is therefore part and parcel of the insurance contract and coverage description.

Contrary to the conclusion of the circuit court, this internal inconsistency rendered the policy ambiguous. "Whether contract language is ambiguous is a question of law, which this Court reviews de novo." *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 563; 596 NW2d 915 (1999).

> An insurance contract is ambiguous when its provisions are capable of conflicting interpretations. Accordingly, *if two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous.* Further, courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity. Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable. [*Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003) (emphasis added) (quotation marks and citations omitted).]

Two provisions of this policy irreconcilably conflict. The General Change Endorsement indicates that only liability coverage had been maintained for the vehicle, while the Coverage Change Endorsement and Schedule of Autos indicate a $0 liability coverage limit in relation to the F800.

-6-

There are two types of ambiguities that may exist in a contract; patent or latent. *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010). The ambiguity before us is patent as it "appears from the face of the document." *Id.* As a patent ambiguity is clear from the language of the document itself, "extrinsic evidence may not be used to identify" it. *Id.* To avoid finding an ambiguity on the face of the document, we would have to ignore either the General Change Endorsement or the Coverage Change Endorsement and Schedule of Autos. This is not permitted. See *Klapp*, 468 Mich at 467. The only way the circuit court could consider extrinsic evidence to determine whether the policy was ambiguous is if the contract was latently ambiguous. As that is not the case here, the court could not consider LEOM's email to IA, IA's policy change request to Secura, the parties' history of transactions, or testimony regarding the parties' beliefs when deciding whether the contract was ambiguous. *Shay*, 487 Mich at 667-668. Rather, this evidence would bear no relevance until it was time to interpret the policy.

Secura contends that the language of Item Two-Schedule of Coverages and Covered Autos removes any ambiguity from the contract. The language instructs that coverage only exists for a particular auto if "one or more symbols" are entered on the "covered auto section." Secura accurately notes that the Schedule of Autos has a blank space next to the liability limit. Although this information is useful in interpreting the parties' intents, it does not change the fact that the General Change Endorsement is also part of the parties' contract and is inconsistent with other contractual provisions.

Accordingly, the circuit court erred in ruling that the insurance policy was unambiguous.

## B. CONTRACT MEANING

We now turn to whether the evidence presented by Secura establishes the parties' intents, such that the case could be summarily resolved, or whether LEOM's contradictory evidence left a genuine issue of material fact precluding summary disposition. "[C]onsideration of extrinsic evidence generally depends on some finding of contractual ambiguity." *City of Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 198; 702 NW2d 106 (2005). "Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996).

The extrinsic evidence relevant to determining the parties' intents in entering this policy comes first from McKeogh's November 24, 2010 email to Medwid at IA. That message indicated LEOM's intent to place the F800 "in storage." The message does not describe what storage coverage means, however. Medwid interpreted McKeogh's message to mean that LEOM wanted to reduce coverage on the F800 to comprehensive only, and submitted a "policy change request" to Secura seeking that level of coverage on December 9, 2010. Medwid's interpretation of McKeogh's email is not definitive evidence of LEOM's intent.

Yatooma testified at his deposition regarding his understanding of the coverage available to a vehicle placed "in storage." Yatooma claimed, "when I initiated insurance with [IA], I specifically discussed the elements of the storage insurance, what we refer to as storage insurance. And it was my understanding very clearly that I would be covered from liability resulting of [sic] a claim." Yet, throughout his deposition, Yatooma explained his understanding

-7-

that a vehicle placed in storage would not be covered if he or his employees decided to drive the vehicle on the road. Rather, the vehicle was covered for the types of damage contemplated in the comprehensive section of the Secura policy, which provides:

> 1. We will pay for "loss" to a covered "auto" or its equipment under:
>
>> a. Comprehensive Coverage
>>
>>> From any cause except:
>>>
>>> (1) The covered "auto's" collision with another object; or
>>>
>>> (2) The covered "auto's" overturn.

To that end, Yatooma described that LEOM would be covered if the vehicle caught fire, exploded, was vandalized, or was stolen while in storage. Yatooma mistakenly believed, however, based on an earlier conversation with an IA representative that comprehensive coverage included some level of liability coverage. Therefore, he was under the incorrect impression that if a vehicle exploded in the storage yard and caused damage to third parties, LEOM would have liability coverage. Liability coverage is completely separate under the policy:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

What is clear is that comprehensive and liability are two separate categories of coverage and must both be purchased if liability coverage will apply to a comprehensive-covered event.

Yatooma's misunderstanding does not change the fact that he intended to secure only comprehensive coverage when his employee asked IA to place the vehicle in storage. That Yatooma thought comprehensive coverage included a subset of liability coverage does not make it so, especially as such belief contravened the policy language. Ultimately, when the insurance contract was made in November and December of 2010, LEOM intended to purchase comprehensive coverage as evidenced by McKeogh's email, IA's policy change request, and Yatooma's deposition testimony. Secura intended to provide only comprehensive coverage as evidenced by the Coverage Change Endorsement and the Schedule of Autos. The parties' intents at the time of contract execution were the same despite the error on the General Change Endorsement.

Further evidence of the parties' understanding of storage coverage is supplied by General Change Endorsements and accompanying documents issued on earlier dates. Secura provided copies of these various change orders from 2010. On July 23, 2010, for example, Secura changed the coverage on the F800 and on a Ford F700 upon LEOM's request. The change removed "comprehensive" coverage and added "liability, PIP, uninsured, property damage buy back, and hired and non-owned" coverage. The accompanying Schedule of Autos and Coverage Change Endorsement stated a $1,000,000 liability policy limit. In September 29, 2010, Secura

amended the coverage on a 1995 Ford F700 to comprehensive only, and the attached Schedule of Autos included a blank space in the liability limit section and an account credit for liability coverage. And on January 21, 2011, LEOM changed the coverage on a 2001 Ford vehicle to delete comprehensive and add liability in order to bring the vehicle back into service. Secura also presented a table created to show LEOM's policy changes since January 5, 2009. The various transactions revealed a pattern of reducing coverage in the fall to comprehensive only and reinstating liability, and sometimes other coverages, in the spring. Overall, the table and insurance change documents establish that LEOM and Secura limited a vehicle's coverage to comprehensive only whenever it was placed in storage.

Secura also contends that it can have no duty to defend or indemnify because LEOM did not pay for liability coverage. In this regard, Secura relies upon *Lee v Evergreen Regency Coop*, 151 Mich App 281; 390 NW2d 183 (1986), which in turn relied upon *Ruddock v Detroit Life Ins Co*, 209 Mich 638; 117 NW 242 (1920). In *Lee* and *Ruddock*, the insurers denied their clients' requests for coverage. When the clients filed suit, the insurers raised additional grounds supporting their denial decisions. The clients retorted that the insurers were estopped from raising these new arguments and had waived them. The Supreme Court rejected use of the estoppel and waiver doctrines because to do so " 'would make this contract of insurance cover a loss it never covered by its terms, to create a liability not created by the contract . . . .' " *Lee*, 151 Mich App at 286, quoting *Ruddock*, 209 Mich at 654.

These cases are inapposite of the issue before us. LEOM is not seeking to prevent Secura from raising any exclusion to coverage; it has raised neither waiver nor estoppel as a defense. (The Hughes did raise estoppel, but they are not the insureds.) Rather, the question is the proper interpretation of the insurance policy. That LEOM may or may not have paid for the disputed coverage is one piece of the puzzle in determining what the parties intended. As noted, it is clear that the parties intended to delete liability coverage and add comprehensive on November 24, 2010. Consistent with that intent, the Schedule of Autos shows that partial premiums were credited to LEOM for liability and other coverages.

Given the plethora of unrebutted evidence that the parties intended in November and December 2010 to remove all coverage except comprehensive for the F800, the circuit court could have granted summary disposition on the alternate ground that there existed no question of fact regarding the true meaning of the ambiguous insurance policy. We therefore affirm the circuit court's declaration that Secura had no duty to defend or indemnify LEOM in the lawsuit filed by the Hughes and that the F800 was an uninsured vehicle for purposes of Citizens' duty to its insureds.

### C. CIRCUIT COURT DID NOT NEED TO WEIGH CREDIBILITY OR RESOLVE FACTUAL ISSUES

LEOM complains that the circuit court had to resolve factual disputes and weigh witness credibility to resolve this matter. However, the conflicting evidence revolves around Yatooma's belief, formed in the spring of 2011, that he had liability insurance. Yatooma's testimony clearly supports his intent at the time of entering the contract to secure only comprehensive coverage for the F800. Although the circuit court made comments about the reasonableness of Yatooma's Spring 2011 beliefs, those beliefs had no effect on the contract's meaning. While the meaning of

an ambiguous contract is a question of fact, the unrebutted evidence supports that the parties intended to enter a contract for comprehensive-only coverage. Accordingly, the court was not required to resolve any factual issues either.

### D. UMBRELLA POLICY

LEOM contends that even if coverage did not exist under the primary policy, it could exist under the umbrella policy also purchased through Secura, making summary disposition inappropriate. However, "umbrella policies require the existence of a primary policy as a condition of coverage." 15 Couch, Insurance § 220.32, p 220-37. "The purpose of . . . umbrella coverage is to protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." *Id.* An umbrella policy may "provide primary coverage for risks that the underlying policy does not cover." *Id.*, pp 220-38 – 220-39. This will depend on the language of the policy.

The Secura Umbrella Policy provided to LEOM details the types of "primary coverages and limits" for which the insured must obtain separate primary insurance. The umbrella policy "will only provide excess coverage after the limits of such other policies have been exhausted." Schedule A includes among the mandatory primary coverages "commercial automobile liability." LEOM makes no argument beyond a mere statement that the umbrella policy might apply. It has not explained how this incident does not fall within the ambit of the commercial automobile policy. And, as noted, as of November 24, 2010, the commercial automobile policy no longer included liability coverage for the subject vehicle. Accordingly, the circuit court did not err by summarily rejecting any claim based on the umbrella policy.

We affirm.


/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

-10-